UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
|  | : |  |
| MINECTOR HUNT | : |  |
|  | : |  |
| v. | : | CIV. NO. 3:11CV01436 (JCH) |
|  | : |  |
| MICHAEL ASTRUE, | : |  |
| COMMISSIONER OF SOCIAL | : |  |
| SECURITY ADMINISTRATION | : |  |
|  | : |  |

RECOMMENDED RULING

Minector Hunt brings this action pursuant to Sections
205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §
405(g) and 1383(c)(3), seeking review of a final decision of the
Commissioner of Social Security, denying Plaintiff Supplemental
Security Income ("SSI") and Disability Insurance Benefits
("DIB").

The plaintiff moves to reverse the Commissioner's decision
**[doc. #18]** on the basis that the record lacks substantial
evidence to support the Commissioner's findings that plaintiff
was not disabled within the meaning of the Act and that the
Administrative Law Judge ("ALJ") erred as a matter of law.  The
government moves to affirm the Commissioner's decision. **[doc. #
28]**.  After reviewing the administrative record in its entirety,
the plaintiff's decision is **REVERSED** and **REMANDED** for

1

proceedings consistent with this opinion.

## I.    STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry.  The court must first decide whether the Commissioner applied the correct legal principles in making the determination.  Next, the court must decide whether the determination is supported by substantial evidence.  _Balsamo v. Chater_, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  _Richardson v. Perales_, 402 U.S. 389, 401 (1971); _Yancey v. Apfel_, 145 F.3d 106, 110 (2d Cir. 1998).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  _Gonzales v. Apfel_, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); _Rodrigues v. Califano_, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  _Dotson v. Shalala_, 1 F.3d 571, 577 (7th Cir. 1993).  The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  In reviewing an ALJ's decision, the court considers the entire administrative record.  _Perez v. Chater_, 77 F.3d 41,

46 (2d Cir. 1996).  The court's responsibility is to ensure that a claim has been fairly evaluated.  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987).  To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity.  Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).  Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding.  Peoples v. Shalala,

No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. 1994); see
generally Ferraris, 728 F.2d at 587.


## II.   ADMINISTRATIVE PROCEEDINGS

On May 31, 2009, the plaintiff filed an application for
Supplemental Security Income and Disability Insurance Benefits.
(Certified Transcript of Record, dated October 27, 2011,
[hereinafter "Tr."] at 10). The plaintiff requested a hearing,
which was conducted by ALJ Kelly Davis on May 12, 2011.  (Tr. at
32).  The plaintiff, represented by counsel, appeared and
testified at the hearing.  (Tr. at 37-59).  A vocational expert,
Warren Maxim, also testified at the hearing.  (Tr. at 59-66).
During the hearing, it was noted that the onset date had been
amended to December 1, 2007. (Tr. at 34).

On May 26, 2011, the ALJ issued a decision, denying the
plaintiff benefits.  (Tr. at 7).  The Decision Review Board had
selected Hunt's claim for review, but due to rule changes within
the Social Security Administration, review of the case was
transferred to the Appeals Council.  (Tr. at 29).  On August 24,
2011, the Appeals Council denied Hunt's request for review,
finding no reason under its rules to review the ALJ's decision.
(Tr. at 1).  As a result, the ALJ's decision became the final
decision of the Commissioner of Social Security.  (Tr. at 1).

4

The plaintiff, represented by counsel, timely filed this action for review of the Commissioner's decision.

## III.   SUBSTANTIAL EVIDENCE

### A.   Activities of Daily Living- undated

On the undated Activities of Daily Living form, the plaintiff stated that during the day he takes his medications and is taken to appointments and counseling.  (Tr. at 253).  His family or a friend brings him to most places.  (Tr. at 256). While he does not take care of anyone else, the plaintiff does feed his pets when he wakes up and his siblings take care of the rest of the pets' needs.  (Tr. at 253-54).  The plaintiff reported that because of his conditions, he can no longer go out, be around crowds of people or talk to others.  (Tr. at 254). His conditions affect his sleep in that sometimes he won't sleep at all and other times he'll sleep a lot.  (Tr. at 254). As far as personal care, the plaintiff stated that he doesn't care what he wears, bathes two to three times a week, and shaves once a week.  (Tr. at 254).

The plaintiff buys his own food, primarily sandwiches and frozen dinners that he reheats. (Tr. at 254-55). The plaintiff does not use the stove because he usually forgets and leaves it on.  (Tr. at 255).  The plaintiff usually forgets to take his

medications. (Tr. at 254). The plaintiff takes Cymbalta, Abilify and Methadone every day. (Tr. at 255). Plaintiff has spent time at a Methadone clinic. (Tr. at 263). He stated that he does not drink alcoholic beverages or use drugs. (Tr. at 263). The plaintiff cleans the room where he sleeps, but not very often. (Tr. at 256). The plaintiff stated that he shops for cat food and items for the cats. (Tr. at 257). The plaintiff is able to pay bills and count change, but he cannot handle a savings account or use a checkbook/ money orders. (Tr. at 257). Since he tends to miscount and lose money, the plaintiff uses a bank card primarily and has his family handle money for him. (Tr. at 257).

The plaintiff watches television from time to time and also sleeps a lot. (Tr. at 257). The only place he goes on a regular basis is the store, where he'll go with someone else. (Tr. at 258). He is mostly by himself because his mood disorder affects his ability to get along with others. (Tr. at 258). His impairments have caused a fear of going outside. (Tr. at 258). His impairments affect his speech, memory, getting along with others, understanding, following instructions and concentration. (Tr. at 258). The plaintiff cannot pay attention for long, cannot finish what he starts and cannot follow written or spoken instructions. (Tr. at 259). Plaintiff

does not handle stress well and has noticed unusual behavior or fears.  (Tr. at 259).

As far as work history, the plaintiff listed that he had worked at Action Link, Dodge Center, Hartford Civic Center, J.C. Penney, Johnston and Murphy, Filene's and Big Y.  (Tr. at 261). These jobs occurred from July 2002 to December 2008, and the plaintiff indicated that all but Johnston and Murphy and Filene's were part time.  (Tr. at 261). At Action Link, the plaintiff would "demo" electronic products.  (Tr. at 262).

### B.    The Plaintiff's Testimony

At the time of the hearing, the plaintiff was thirty-two years old.  (Tr. at 37).  The plaintiff completed the tenth grade; however, while in school, he was in special education and had behavior problems.  (Tr. at 37-38). The plaintiff also testified that he repeated the third grade.  (Tr. at 37).

While the plaintiff has never had a full-time job, he testified that he has worked "part-time stock" and done temp work.  (Tr. at 38).  The plaintiff stated that the longest job he has held was at the Big Y, where he worked for five to six months.  (Tr. at 38).  The plaintiff testified that he has had so many jobs because he kept getting fired for not being able to keep up with the work.  (Tr. at 38). He stated that he was doing his best at work, but that his stress would get in the way, and

that it would become more stressful when he couldn't do the job.
(Tr. at 38).  The plaintiff testified that he worked at the
Civic Center but was fired from that job. (Tr. at 39). He also
worked at Madison Square Garden as a ticket handler but again
was fired after asking a performer for an autograph, which was
not allowed.  (Tr. at 39).  He worked at Filene's, but testified
that he couldn't keep up with the work because "stress got in
the way." (Tr. at 42).  He worked as a sales rep at Filenes for
between six months and a year and got past the initial training.
(Tr. at 42).  The plaintiff also worked at A & P Coat, Apron, &
Linen Supply where he washed clothes and sheets for the
hospital, but he was fired for being unable to complete the
required number of jobs per day.  (Tr. at 43).  The plaintiff
testified that he had trouble getting along with co-workers at
Fliene's and K&G and that his co-workers were lazy.  (Tr. at
43).  The plaintiff testified that his bosses would yell at him
a lot, telling him to "pick up the pace."  (Tr. at 43-44).  The
plaintiff stated that he had trouble "learning new things to
sell" because it was hard "keeping up with the new merchandises
to sell to the customers" and communicating with the customers.
(Tr. at 44). He has trouble multi-tasking, and cannot stock and
work the floor.  (Tr. at 44).

His most recent job was at Action Link, where he was on-call and worked as a "demo wreck,"[1] but they stopped calling him for work.  (Tr. at 40).  The plaintiff was supposed to be learning about computers, cameras, and TVs to sell to customers, but the plaintiff testified that he was unable to learn about the equipment in the little time that Action Link wanted, and he stated that he was not good at this job.  (Tr. at 41).  The plaintiff testified that he does not think he can work at all. (Tr. at 44).

The plaintiff lives in a rooming house. (Tr. at 45). He stated that if the owners of the house had not taken him in, he would have been homeless because his brother had abandoned him. (Tr. at 45-46).  The plaintiff stated his brother left with no advance notice, and because of this, the plaintiff "wanted to fight him." (Tr. at 46.) The only money he has is cash assistance from the State, which is receives because of his conditions.  (Tr. at 45). The plaintiff does not do chores around the rooming house, but he does clean his room sometimes. (Tr. at 46). The plaintiff does not know how to write a check, has some trouble keeping track of money because he tends to lose

---

[1] The Court notes that in the Transcript of Oral Hearing, the plaintiff's position is recorded as "demo wreck," while the ALJ refers to the plaintiff's position at Action Link as a "Demo Rep" in her written decision. Given the plaintiff's description of his position, in all likelihood, he in fact was a demo representative or "demo rep."

loose bills or cash, and does everything with a bank card.  (Tr. at 46).  The only bill he pays is his rent, and his brother helped him with his SSI application.  (Tr. at 46-47).  The other people in the rooming house leave the plaintiff alone because they know of his conditions, the plaintiff does not have any friends, and he has lost friends because of his mood disorders and because they were bad influences.  (Tr. at 48).

The plaintiff has trouble keeping himself clean, and at the time of the hearing, he had long nails, although the plaintiff said he cuts them sometimes.  (Tr. at 47).  The plaintiff's roommates do not like his cooking because they know he does not know how to cook and burns things.  (Tr. at 49).  When a neighbor was trying to teach the plaintiff how to cook, he burned the kitchen.  (Tr. at 49).  When preparing meals for himself, the plaintiff makes TV dinners and "stuff in the microwave." (Tr. at 49).

In 1997, his girlfriend's son lit their apartment on fire. (Tr. at 49).  They were left homeless and without any money, so the plaintiff robbed a convenient[2] store with a gun.  (Tr. at 50).  He went to jail at age nineteen and spent five years there.  (Tr. at 50, 52).  He ended up in segregation three times for getting caught with a shank, which he had for protection.

_____

[2] The Court notes that the Transcript of Oral Hearing reference to a "convenient" store is likely a "convenience" store.

(Tr. at 50). His son was born while he was in prison.  (Tr. at 50).  He tried to keep in touch with his son but has not, and this causes him pain "somewhat."  (Tr. at 51).  His family has tried to arrange a visit with his son, and one time they went to visit his son, although the plaintiff had to stay in the car and did not get to go in.  (Tr. at 51).  The plaintiff never wrote to his son, and while he does know how to write a letter, he doesn't remember if he's ever written one. (Tr. at 51).

The plaintiff thinks he has "somewhat" of a problem with authority and people telling him what to do.  (Tr. at 52).  He has been arrested for fighting "a lot of times."  (Tr. at 52).  The plaintiff does not have a significant other because he has to "get better first."  (Tr. at 52-53).

The plaintiff spends a typical day in his room, and can go weeks without speaking to anybody.  (Tr. at 53).  He usually sleeps three to four hours a night, but sleeps most of the day.  (Tr. at 53).  The plaintiff talks to dead people, and stated that some of them are good company while others are bad company.  (Tr. at 53).  The nice dead people he talks to are his mother and grandmother. (Tr. at 54). He is tormented by his cousin, who tells him to end his life.  (Tr. at 53).  The plaintiff has attempted to commit suicide three times (by drowning, putting a gun to his head, and overdosing).  (Tr. at 54).  When he tried

11

to commit suicide in prison, he was placed on suicide watch. (Tr. at 54).  His doctor, Dr. Jean Jarda, prescribed Abilify 50 mg, Cymbalta 120, and Paxil.  (Tr. at 54).  The medications have helped to stop the voices but the plaintiff stated that he still hears them and does not enjoy talking to these people.  (Tr. at 54-55).  He thinks about his own death a lot and, although his mood has improved since taking the medications, he is still depressed.  (Tr. at 55).

The plaintiff is depressed, bipolar, has mood disorders, anxiety, paranoia and OCD.  (Tr. at 55).  In terms of the OCD, the plaintiff constantly checks things and has to keep things in a certain way.  (Tr. at 55).  The plaintiff has flashbacks which result in cold sweats and not feeling well.  (Tr. at 55).  When he was young, someone attempted to drown the plaintiff and, in addition, the plaintiff was molested, "somewhat raped," and shot at.  (Tr. at 56).  His father, who was "somewhat" a drunk, beat him. (Tr. at 56).

The plaintiff stated that he is overweight and has been told to exercise more, but he does not exercise.  (Tr. at 47-48).  The plaintiff has trouble leaving the house because he's paranoid to go outside and also has physical difficulties leaving the house because of a "left ankle that is messed up in pain" and lower back problems.  (Tr. at 48).   He fears

12

something bad will happen to him if he goes outside, like
something falling on him, getting run over by a car, getting
shot at from behind, or getting stabbed. (Tr. at 56).  He thinks
about doing these things to bad people if they were to come at
him.  (Tr. at 56).  The plaintiff does not like hurting himself,
but thinks about what the sensation of pain would be like and
wants others to feel his pain.  (Tr. at 56-57).  He has trouble
expressing himself and was told to attend group therapy
sessions.  (Tr. at 57).  He couldn't do this because he doesn't
like to be in crowds or express himself to a lot of people.
(Tr. at 57). He has trouble when he goes to see Marva Beckford,
LCSW at Community Health Services, because she expects him to
initiate the conversation and doesn't speak to him.  (Tr. at
57). He'll sometimes sit there for fifty minutes with no one
talking.  (Tr. at 57).  He thinks Dr. Jarda is "all right"
because Dr. Jarda will talk to him and the plaintiff thinks the
doctor somewhat understands him.  (Tr. at 57-58). Even though
his family had encouraged him to seek mental health treatment,
it took him a long time to have it addressed because he was in
denial.  (Tr. at 59).

    In terms of physical problems, the plaintiff stated that he
has chest pain above his heart, but he hasn't taken care of it.
(Tr. at 58).  He has a lot of headaches from his neck, which

started because of a fight when he was young.  (Tr. at 58).  He
gets migraine headaches three to four times per week.  (Tr. at
58).  When he gets a headache, he takes more medicine than he's
supposed to (600mg of Motrin) and he has to lie down.  (Tr. at
58).  He's pretty much down for the day and gets in a very bad
mood.  (Tr. at 58).

He broke his left ankle on a skateboard and cannot rotate
it in the same way he rotates his right ankle.  (Tr. at 59).  If
he steps on his ankle in the wrong way, he will go to the
hospital because it starts to hurt and swells up.  (Tr. at 59).
He can stand on his feet for half an hour to forty-five minutes.
(Tr. at 59).

### C.  Vocational Expert's Testimony- Warren Maxim

Vocational expert ("VE") Warren Maxim also testified at the
hearing.  (Tr. at 59-66).  Mr. Maxim testified that the
plaintiff performed light work as an in-store demonstrator, when
he worked in an optical factory, and when he worked as a meat
department clerk.  (Tr. at 61).  When the plaintiff worked in a
department store, he did light work as a salesperson and
cashier, and medium work when he did some stocking.  (Tr. at
61). The plaintiff's laundry work is medium.  (Tr. at 62). The
ALJ then asked Mr. Maxim about some hypothetical situations.
(Tr. at 62).  If a hypothetical person were able to work in a

14

work environment without strict time or production quotas, no
interaction with the general public and brief superficial
interaction co-workers or supervisors, the VE stated this person
would only be able to engage in the plaintiff's past relevant
work of laundry and optical factory work.  (Tr. 62).  The VE
testified that in the national economy, there are over 40,000
laundry worker jobs available and 476 such jobs in Connecticut.
(Tr. at 63-64).  The VE stated that with the above restrictions,
a person could also be a garbage collector.  (Tr. at 64).  There
are 112,000 such jobs in the national economy and 1,300
regionally.  (Tr. at 64).  A person with those restrictions
could also be a general warehouse worker, of which there are
562,000 jobs nationally and 4,700 jobs in Connecticut.  (Tr. at
64-65).  However, when the ALJ told the VE to assume in the
hypothetical that the individual would be of the same age,
education and work experience as the plaintiff, and also that
the hypothetical individual might be off-task up to twenty
percent of the time, the VE concluded the jobs he had suggested
would be eliminated as would "essentially all work" because this
limitation would require extra supervision as an accommodation.
(Tr. at 65).  The VE stated that being off-task more than ten
percent of the time would not be acceptable.  (Tr. at 66). When
asked about absenteeism that might occur with an impairment like

15

migraine headaches, the VE testified that absenteeism in excess
of twelve days a year would not be tolerated for very long.
(Tr. at 66). This concluded the VE's testimony.  (Tr. at 66).

D.   **Medical Records**

     **Mental Health**

     In an undated Department of Social Services ("DSS") Medical
Report[3] prepared by Amy Taylor, MD, it is noted that the
plaintiff complained of decreased energy, low concentration and
poor memory from his depression.  (Tr. at 284).  Dr. Taylor
states that, "due to depression, not able to concentrate enough
at this time to work." (Tr. at 284).  She also stated that
"prognosis is fair- based on his willingness to take meds and to
engage in therapy."  (Tr. at 284).  In terms of understanding
and memory, Dr. Taylor indicated that the plaintiff is not
significantly limited in remembering locations and work like
procedures, and is moderately limited in understanding and
remembering both simple and detailed instructions. (Tr. at 288).
As to sustained concentration and persistence, the plaintiff is
markedly limited in carrying out detailed instructions;
moderately limited in carrying out short, simple instructions,

---

[3] At the end of the form (Tr. at 291), Dr. Taylor has provided
her signature and title yet did not record a date where
indicated.  The report was printed on October 26, 2009, so it is
assumed the evaluation occurred prior to this date.

maintaining attention for extended periods, performing activities within a schedule or completing a normal workday/ workweek without interruptions from psychologically passed symptoms; and not significantly limited in sustaining an ordinary routine without special supervision, working in coordination with others, or making simple work-related decisions.  (Tr. at 288). As to social interaction, the plaintiff is markedly limited in accepting instructions and responding appropriately to criticism from supervisors; moderately limited in asking simple questions/ requesting assistance or getting along with co-workers; and not significantly limited in interacting appropriately with the general public or maintaining socially appropriate behavior. (Tr. at 289). As to adaptation, the plaintiff is moderately limited in responding appropriately to changes in the work setting or setting realistic goals independently of others; and he is not significantly limited in being aware of normal hazards or traveling in unfamiliar places or using public transportation.  (Tr. at 289).  Dr. Taylor also indicated that, as of July 2008, the plaintiff has been receiving counseling and psychopharmacology at Community Health Center.  (Tr. at 290).

The plaintiff was seen regularly at Community Health Services between February 2008 and February 2011 for depression.

17

(Tr. at 344-393, 495-526).  He was seen primarily by Dr. Jean Jarda and Marva Beckford, LCSW, and his visits consistently alternated between the two.  (Tr. at 344-393, 495-526).  A report from February 11, 2009, notes that the plaintiff's depression was above normal limits.  (Tr. at 387).  An October 5, 2009, report notes that the plaintiff complained of difficulty going outside on his own, and an October 15, 2009, report notes that the plaintiff sleeps fourteen hours a day.  (Tr. at 378, 381).

In a report from January 5, 2010, Marva Beckford, LCSW, recorded that the plaintiff had been diagnosed with opioid dependence, major depression and personality disorder.  (Tr. at 376).  Her notes state:

> Client states that he continues to work on his socialization skills and trying to go out more and not isolates [sic] as much.  Client states that he made the effort to go to a New Years party and stayed longer than he expected (4 hours).  Client states that he was uncomfortable, anxious and nervous being there but he forced himself to stay as he wants to work on himself to see if he could do it.  Reports that he did engage in some small talk but he would have to go outside to feel the air.  Client states that he always felt uncomfortable talking to people as he wasn't allowed to express himself as a child and he now feel [sic] uncomfortable doing so.  Client reports that he is usually by himself so it is awkward being around people.  Client is proud of himself for this and felt that it was progress for him. . .

(Tr. at 376).  She also noted that the plaintiff was hoping to be off methadone soon.  (Tr. at 376).

On January 21, 2010, Dr. Jarda filled out a Mental
Impairment Questionnaire for the plaintiff.  (Tr. at 292-95).
At that time, Dr. Jarda had been treating the plaintiff since
November 2009 and indicated that the plaintiff had shown no
improvement since treatment began.  (Tr. at 292).  Dr. Jarda
stated that the plaintiff "has been severely depressed for years
with suicidal ideation and auditory hallucinations (off and on)
for years." (Tr. at 292).  Dr. Jarda noted poor attention and
decreased concentration (Tr. at 293).  The doctor stated that
the plaintiff has "no problem" "taking care of personal hygiene"
and "caring for physical needs," "has an obvious problem" "using
good judgment regarding safety and dangerous circumstances," and
"has a very serious problem" "using appropriate coping skills to
meet ordinary demands of a work environment" and "handling
frustration appropriately." (Tr. at 293).  Dr. Jarda also
recorded that the plaintiff "has a very serious problem"
"interacting appropriately with others in a work environment,"
"asking questions or requesting assistance," "respecting/
responding appropriately to others in authority," and "getting
along with others without distracting them or exhibiting
behavioral extremes."  (Tr. at 294).  Finally, Dr. Jarda stated
that the plaintiff "has an obvious problem" "carrying out
single-step instructions," and "has a very serious problem"

19

"carrying out multi-step instructions," "focusing long enough to finish assigned simple activities or tasks," "changing from one simple task to another," "performing basic work activities at a reasonable pace/ finishing on time," and "performing work activity on a sustained basis."  (Tr. at 294).

In the medical records from the plaintiff's visit on January 21, 2010, Dr. Jarda noted that the plaintiff expressed concerns about his living arrangements and voices he had heard the previous week.  (Tr. at 374).  Dr. Jarda also noted neither side effects reported from the medications nor any complaints by the plaintiff.  (Tr. at 374).  Marva Beckford's notes from the plaintiff's January 25, 2010, visit confirmed that the plaintiff was continuing to have problems with his living arrangements with his brother.  (Tr. at 373). On February 1, 2010, Beckford mentioned in her notes that the plaintiff indicated that he is "cursed and possessed" because of a curse his father put on him. (Tr. at 372).  They discussed taking responsibility for choices and decisions, but Beckford noted that the plaintiff didn't seem to want to commit to changing his behavior and circumstances. (Tr. at 372).

On February 16, 2010, Dr. Jarda noted that the plaintiff seemed to be doing very well with his current treatments and that the plaintiff reported being "highly motivated to remain

sober after he discontinues use of Methadone." (Tr. at 370).  On
February 22, 2010, Beckford also reported that the plaintiff's
affect was brighter and that the plaintiff indicated wanting to
get his life together, although she noted that he didn't seem to
know what he would need to do.  (Tr. at 369). Beckford's notes
from March 1, 2010 indicated that she discussed with plaintiff
the possibility of finding a job, and that the plaintiff stated,
without specifying any reasons, that he is unable to work.  (Tr.
at 364). Dr. Jarda noted on March 18, 2010, that the plaintiff
looked and sounded better, and that the plaintiff stated
"feeling more at ease in the community."  (Tr. at 362).
Beckford's notes from March 29, 2010, and Dr. Jarda's notes from
April 14, 2010, both indicated that the plaintiff's brother had
moved out, which was causing the plaintiff a lot of worry about
where he was going to live.  (Tr. at 358, 361).  By his April
14, 2010, visit, Beckford noted that the plaintiff had moved
into a room by himself but was upset because this required him
to give his kittens away.  (Tr. at 356). On a June 3, 2010
visit, Beckford noted that the plaintiff's long-term goal was to
"replace dichotomous thinking with ability to tolerate ambiguity
and complexity in people and issues."  (Tr. at 354). One of the
plaintiff's short term objectives included being able to
"[r]educe the frequency of maladaptive behaviors, thoughts and

feelings that interfere with attaining a reasonable quality of life." (Tr. at 354). On June 4, 2010, the plaintiff attended his second group therapy session where the clinician noted that the plaintiff wanted to get his life back on track, especially his family relationships.  (Tr. at 352).

Dr. Jarda noted on June 17, 2010, that the plaintiff reported doing better than he had in the past two months and was "very happy" about his room in the group home.  (Tr. at 350). While the doctor noted that the plaintiff was still complaining of being depressed more often than not, he seemed "better overall."  (Tr. at 350). On June 28, 2010, Beckford and the plaintiff discussed the plaintiff's failure to attend any additional group therapy sessions, in addition to the plaintiff's motivation and commitment to move forward.  (Tr. at 349).  Beckford noted that the plaintiff continued to show a lack of both motivation and commitment. (Tr. at 349). On July 1, 2010, Dr. Jarda noted that the plaintiff had recently been started on Paxil, in addition to Cymbalta and Abilify, and his affect seemed "brighter, more appropriate."  (Tr. at 347). Beckford recorded on July 26, 2010, that the plaintiff had been spending time with a friend, going out to eat on a regular basis.  (Tr. at 346).  While the plaintiff denied having any plans to hurt himself, the plaintiff mentioned having thoughts

22

of "jumping through a window to break his leg just to feel the pain," but this and other thoughts about dying were "in the back of his mind." (Tr. at 346).  Dr. Jarda's report from September 9, 2010, noted that the plaintiff had been "feeling better recently, less depressed, more active, more motivated, more sociable," and that he "likes feeling this way and is determined to keep it this way."  (Tr. at 344).  On September 29, 2010, Dr. Jarda noted that the plaintiff was still enjoying his room at the group home and being in "a quiet neighborhood." (Tr. at 524).  On October 11, 2010, the plaintiff met with Beckford and discussed his sexuality because the plaintiff had stopped going out with friend as much because of the fear that others might think he was gay. (Tr. at 521).  Beckford noted that while the plaintiff denied being gay or having "'gay'" feelings, his body language was contradictory.  (Tr. at 521).  The plaintiff told Dr. Jarda he was doing well on October 26, 2010, despite having had flashbacks of past experiences.  (Tr. at 518).  On November 11, 2010, Beckford mentioned that she and the plaintiff discussed his childhood sexual abuse by both males and females, and physical abuse by his father, noting that it appears that the plaintiff is unable to build relationships with anyone significant in his life.  (Tr. at 515).  In addition to his previous short-term goals, at this session, she added goals of

being able to verbalize "an increased knowledge of sexual abuse and its effects," and being able to "identify and express feelings associate with the abuse. . . without feeling embarrassed and ashamed." (Tr. at 513). Their discussion about childhood sexual abuse continued at their December 15, 2010, and January 10, 2011 appointments. (Tr. at 499, 508).

On December 17, 2010, Dr. Jarda noted that the plaintiff had been feeling depressed but "dealing with it appropriately." The plaintiff stated that his living arrangement "still sucks," but he was also looking for an apartment and learning to cook. (Tr. at 510). The plaintiff reported no longer hearing the voices that used to tell him to hurt himself. (Tr. at 510). On January 5, 2011, Dr. Jarda noted that the plaintiff had "no symptoms consistent with depression." (Tr. at 501). During the plaintiff's January 24, 2011, visit, the plaintiff told Beckford that he wanted to go to Puerto Rico to speak with his father about unresolved issues and to let go of bad feelings. (Tr. at 497). Beckford stated that this "shows some progress in his thinking." (Tr. at 497). On February 14, 2001, Beckford and the plaintiff discussed what the plaintiff felt he needed to work on for the future. (Tr. at 495).

### 1.   Substance Abuse

The plaintiff has a history of heroin and cocaine abuse,
starting at age fourteen (cocaine) and fifteen (heroin) until
November 21, 2005, which is when he first sought treatment.
(Tr. at 561, 568).  Upon entering treatment, he was stabilized
on Methadone and remained on the drug for five years before
going through a voluntary detox.  (Tr. at 501, 569).  Based on
monthly substance abuse testing between January 2008 and
September 2010, there were no narcotics present in the
plaintiff's system apart from Methadone.  (Tr. at 570-603) On
June 17, 2010, the plaintiff was on 8 mg of Methadone; by
September 29, 2010, he had decreased to 1 mg (Tr. at 524, 537).
Beckford reported that on October 11, 2010, the plaintiff was
off Methadone and very happy about that.  (Tr. at 521).  Dr.
Jarda noted on October 26, 2010, that the plaintiff's goal was
to remain sober after he ended the Methadone.  (Tr. at 518).
However, on January 5, 2011, the plaintiff reported buying
Suboxone off of the streets, and Dr. Jarda recommended that he
consider going back to a drug treatment program.  (Tr. at 501).

### 2.   Physical Impairments

The plaintiff also complains of various physical
impairments, for which he was seen at Community Health Services
between February 2008 and September 2010.  (Tr. at 344-393).

25

Throughout this time, the plaintiff's obesity was a concern and diet and exercise were frequently discussed.  (Tr. at 378, 379, 388, 392).

During the plaintiff's visits to Dr. Jarda for his depression, Dr. Jarda noted that the plaintiff had no acute medical problems.  (Tr. at 347, 350).

The plaintiff has a history of asthma, which led to treatment at St. Francis Hospital and Medical Center for bronchitis in 2004 (Tr. at 457-464).  In December 2004, the plaintiff was seen at St. Francis Hospital for acute exacerbation of his asthma and given inhaled bronchodilator medicine.  (Tr. at 474-475). In March 2005, the plaintiff was again seen at St. Francis for his asthma.  (Tr. at 489).

### 3.   State Agency Medical Consultant- Dr. Kelly Rogers

Dr. Kelly Rogers, PhD, a State agency psychological consultant, reviewed the record on March 25, 2010.  Dr. Rogers determined that the plaintiff had mild restriction of activities of daily living, moderate difficulties in maining social functioning and moderal difficulties in maintaining concentration, persistence and pace.  (Tr. at 88). Furthermore, Dr. Rogers determined that the plaintiff had one or two episodes of decompensation of extended duration. (Tr. at 88). Dr. Rogers explained:

26

> [v]ariable mood/ interest/ energy/ frustration
> tolerance lead to impersistence and to disruptions in
> attention/ focus.  While significant, these do not
> preclude routine exercise of work consisting of three
> elements or more for periods of at least two hours in
> the course of a normal workday/ work week.  Due to
> impersistence, he will require a job without strict
> production quotas.  He can work in the presence of
> others, and can adequately monitor his work for
> quality, making corrections as necessary.

(Tr. at 90).  She also stated that, "[l]ability of mood leads to

some inappropriate interaction with others.  He can, however,

accept task-specific direction and feedback.  He can engage in

occasional (1/3 of time) cooperative work with others in the

workplace.  Basic self-care is intact."  (Tr. at 91).


## IV.   DISABILITY UNDER THE ACT

To qualify as disabled under the Act, an individual must be

unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 423(d)(1).  The Act does not

contemplate degrees of disability or allow for an award based on

partial disability.  Stephens v. Heckler, 766 F.2d 284, 285 (7th

Cir. 1985).

Such a "physical or mental impairment" must be supported by

27

medically acceptable clinical and laboratory techniques.   42
U.S.C. § 423(d)(3).  The facts considered in determining
disability are the objective medical facts; the diagnoses or
medical opinions that can be inferred from these facts;
subjective evidence of pain or disability; and the educational
background, age, and work experience of the claimant.  Mongeur
v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).  In order to be
eligible for disability benefits a person must: have insured
status under the program, have not reached the statutory
retirement age, have filed an application for benefits, and have
been determined to be disabled as defined in the Act.  42 U.S.C.
§ 423(a)(1).


**V.   THE ALJ'S DECISION**

Under the Social Security Act, every individual who is under a
disability is entitled to disability insurance benefits. See 42
U.S.C. § 423(a)(1)(E). "Disability" is defined as an "inability
to engage in any substantial gainful activity by reason of a
medically determinable physical or mental impairment which can
be expected . . . to last for a continuous period of not less
than 12 months." 42 U.S.C. § 423(d)(1)(A).

Determining whether a claimant is disabled requires a five-
step process. See 20 C.F.R. § 404.1520. First, the ALJ must

determine whether the claimant is currently working. See 20
C.F.R. § 404.1520(a)(4)(I). If the claimant is currently
employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If
the claimant is not working, as a second step, the ALJ must make
a finding as to the existence of a severe mental or physical
impairment; if none exists, the claim is also denied. See 20
C.F.R. § 404.1520(c). If the claimant is found to have a severe
impairment, the third step is to compare the claimant's
impairment with those in Appendix 1 of the Regulations [the
"Listings"]. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482
U.S. 137 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's
impairment meets or equals one of the impairments in the
Listings, the claimant is automatically considered disabled. See
20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If
the claimant's impairment does not meet or equal one of the
listed impairments, as a fourth step, he will have to show that
he cannot perform his former work. See 20 C.F.R. § 404.1520(e)-
(f). If the claimant shows he cannot perform his former work,
the burden shifts to the Commissioner to show that the claimant
can perform other gainful work. See Balsamo, 142 F.3d at 80
(citations omitted). Accordingly, a claimant is entitled to
receive disability benefits only if he shows he cannot perform
his former employment, and the Commissioner fails to show that

29

the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity by using the Medical-Vocational Guidelines set forth in the SSA Regulations ["the Grid"]. See 20 C.F.R. § 416.945(a) (defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations). The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled. A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered. See 20 C.F.R., Part. 404, Subpart P, App. 2, 20 C.F.R. § 200.00(e)(1). If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual

30

functional capacity. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

Following the five step evaluation process, ALJ Davis found that the plaintiff is not disabled because he has a residual functional capacity to perform a full range of work at all exertional levels. (Tr. at 15). At the first step, ALJ Davis found that the claimant had not engaged in substantial gainful activity since December 28, 2008, which she stated as the alleged onset date.[4] (Tr. at 12). At step two, the ALJ found that the plaintiff suffered from the following severe medically determinable impairments: major depressive disorder, borderline personality disorder and opioid dependence. (Tr. at 13).

At step three, the ALJ found that the plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. at 13). Specifically, the ALJ found that the "paragraph B" criteria were not satisfied, which require that "the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social function;

---

[4] As the plaintiff argues in his motion the alleged onset date was amended during the plaintiff's hearing on May 12, 2011 to be December 1, 2007. [doc. #18]. The defendant in his motion agrees the alleged onset date had been amended to December 1, 2007. [doc. #28].

marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration." (Tr. at 13-14). The ALJ noted that "a marked limitation means more than moderate but less than extreme," and "[r]epeated episodes of decompensation. . . means three episodes in 1 year. . . each lasting for at least 2 weeks." (Tr. at 14). Noting that the plaintiff's mental impairment did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration," the ALJ found that the "paragraph B" criteria had not been satisfied. (Tr. at 14). The ALJ also considered whether "the paragraph C" criteria had been satisfied, and found that they had not. (Tr. at 15).

Specifically, the ALJ noted that the plaintiff had only "mild restrictions" in activities of daily living, and had "moderate difficulties" in the areas of social functioning and concentration, persistence and pace. (Tr. at 14). The ALJ found that the plaintiff had "experienced one to two episodes of decompensation," both of extended duration. (Tr. at 14). At step four, the ALJ found the plaintiff could not perform his past relevant work. (Tr. at 22).

For the fifth and final step of the evaluation, ALJ Davis found that the plaintiff had the residual functional capacity to

32

perform a full range of work at all exertional levels. (Tr. at 15).  The ALJ noted in terms of the plaintiff's nonexertional limitations:

> The claimant is able to understand, remember, and carry out simple, routine, repetitive type tasks, for at least 2-hour periods of time, in the course of a normal workday/ workweek.  The claimant cannot work in an environment with strict time or production quotas. The claimant cannot interact with the general public, but he can engage in brief, superficial interaction with coworkers and supervisors.

(Tr. at 15).  The ALJ found that the plaintiff is not disabled because there are jobs in the national economy the plaintiff could perform.  (Tr. at 23).


## VI.  DISCUSSION

The plaintiff's arguments are numerous and, as is common in Social Security cases, they are interrelated.  The plaintiff argues that the ALJ committed error in ignoring the plaintiff's arguments, failing to consider the plaintiff's obesity, failing to ensure that the medical record was complete, failing to amend the onset date, failing to evaluate material evidence, and ignoring favorable VE testimony.  The plaintiff also argues that the ALJ's decision is not supported by substantial evidence, the ALJ failed to accord controlling weight to the treating physician, the ALJ erred in her finding that the plaintiff's

33

testimony was not credible, and the ALJ erred in failing to incorporate all the limitations of the residual functional capacity.  The Court will first address the plaintiff's argument that the ALJ failed to accord controlling weight to the treating physician.

### A.   Controlling Weight

The plaintiff argues that the ALJ erred in not according controlling weight to the treating physician in conflict with the "treating physician rule."  The ALJ accorded "little weight" to the findings of treating physician, Dr. Jarda; accorded "some weight" to the findings of psychiatrist, Dr. Taylor; and accorded "great weight" to the findings of State agency psychological consultant, Dr. Rogers. (Tr. at 19, 20).

It is undisputed by the ALJ and the parties that Dr. Jarda is the plaintiff's treating physician.  (Tr. at 20), [doc. #18], [doc. #28]. However, the ALJ failed to accord appropriate weight to the opinions of Dr. Jarda based on the "treating physician rule" and the extensive and clear-cut case law in the Second Circuit.  Medical opinions, in contrast to medical records, are judgments about the nature and severity of impairment(s), including symptoms, diagnosis and prognosis, what the patient can still do despite the impairment(s) and the patient's physical or mental impairments.  20 C.F.R. § 404.1527(a)(2).

34

In the Second Circuit, a treating physician's opinion is entitled to controlling weight if it is supported by medical evidence and is not inconsistent with other evidence. See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)(citing 20 §404.1527(d)(2)). When the opinions of a treating physician are contradicted by other substantial evidence in the record, they need not be given controlling weight. Veino v. Barnhart, 312 F.3d 578,588 (2d Cir. 2002). "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decision makers from their obligation . . . under 20 C.F.R. § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).

Section 404.1527(d) sets out the factors that the ALJ must consider in deciding the weight to give medical opinions that are not entitled to controlling weight. Generally, more weight is given to an opinion of a source who has examined the plaintiff than to the opinion of a source who has not examined the plaintiff. 20 C.F.R. § 404.1527(d)(1). When a treating source has evaluated the plaintiff long enough to obtain a longitudinal picture of the impairment, the opinion is given

more weight than an opinion of a nontreating source. 20 C.F.R. §
404.1527(d)(2)(i). The more knowledge a treating source has
about the impairment, the more weight will be given to the
source's medical opinion. 20 C.F.R. § 404.1527(d)(2)(ii).  The
more a medical source presents relevant evidence in support of
his opinion, the more weight will be given, and with
nonexamining sources, the amount of the weight given to their
opinions will depend on the degree to which they provide
supporting explanations. 20 C.F.R. § 404.1527(d)(3). The more
consistent an opinion is with the record as a whole, the more
weight it will be given.  20 C.F.R. § 404.1527(d)(4).  Finally,
greater weight will be given to a specialist in regards to
impairments related to the specialty than to opinions not of a
specialist. 20 C.F.R. § 404.1527(d)(5).

Here, ALJ Davis gave Dr. Jarda's opinions only "little
weight" because she believed that Dr. Jarda's written Medical
Impairment Questionnaire from January 2010 conflicted with his
later findings. ALJ Davis never explicitly evaluated Dr. Jarda's
findings under the standards of 20 C.F.R. § 404.1527(d) in
making her determination to accord weight.  Rather, ALJ Davis
justified her accord of "little weight" to Dr. Jarda's opinions
because of a perceived conflict between the January 2010
evaluation and later findings.  However, when the factors set

36

forth under § 404.1527(d) are evaluated for both Dr. Jarda and
Dr. Rogers, it is clear that Dr. Jarda's opinions should have
been afforded greater weight than the opinions of Dr. Rogers, to
which the ALJ gave "great weight." There is no question that Dr.
Jarda's treatment of the plaintiff from November 2009 until the
end of the medical records in January 2011 is long enough to
provide a "longitudinal picture" of the plaintiff's impairments.
(Tr. at 292, 501); 20 C.F.R. §404.1527(d)(2)(1). In contrast,
Dr. Rogers never examined the plaintiff and based her opinion on
a review of the treatment records. Furthermore, the findings Dr.
Jarda makes are supportable and consistent with the record as a
whole.  A large portion of the record is made up of notes from
the plaintiff's appointments with Dr. Jarda and LCSW Beckford,
and their findings in regards to the plaintiff's mental health
are consistent throughout the record.  Dr. Jarda's remarks about
the plaintiff's mental health are frequently mirrored by LCSW
Beckford's findings for that same time period.  (Tr. at 344,
346, 347, 356, 358, 362, 364, 372, 374).  Nor do Dr. Jarda's
later findings necessarily conflict with his January 2010 Mental
Impairment Questionnaire.  During the course of treating the
plaintiff throughout 2010 and into 2011, Dr. Jarda states that
the plaintiff is improving; however, he never reevaluated the
plaintiff for the criteria that were included in the January

2010 Mental Impairment Questionaire.  Finally in regards to the last factor under § 404.1527(d)(5), Dr. Jarda is a psychiatrist and therefore a specialist in the field of mental health.

The circuit courts have found the opinions of reviewing doctors to be of limited value.  See Penny v. Sullivan, 2 F.3d 953, 957 (9th Cir. 1993). Consulting physicians' opinions based solely on review of the medical reports in the record are "medical sophistry at best." Nelson v. Heckler, 712 F.2d 346, 348 (8th Cir. 1983).  Here, the ALJ gave controlling weight only to the opinions of the reviewing doctor, Dr. Rogers, who solely reviewed the plaintiff's medical records without examining the plaintiff.  (Tr. at 19).  There seems to be no legitimate reason, nor has the ALJ articulated one, to have accorded greater weight to the opinions of the review physician over the treating physician.

Furthermore, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citing Echevarria v. Secretary of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)). If the ALJ believed that Dr. Jarda's assessment conflicted with his later findings, the ALJ had the obligation to contact a treating source, Dr. Jarda, to obtain a

38

more recent Mental Impairment Questionnaire or other assessment.[5] On remand, the ALJ should instruct Dr. Jarda to complete a current Mental Impairment Questionnaire, taking into consideration the patient's impairments as they exist now.

According the review physician greater weight than the treating physician was error. See Foxman v. Barnhart, 157 Fed. Appx. 344, 347-48 (2d Cir. 2005). On remand, the ALJ should ensure that an up-to-date Mental Impairment Questionnaire by Dr. Jarda is obtained, and the ALJ should accord controlling weight where warranted and weigh all other medical evidence according to the factors set forth in § 404.1527(d). The ALJ must articulate why she is not crediting a treating physician's opinions. Snell, 177 F.3d at 134. Because this error justifies remand, the Court will refrain from discussing the plaintiff's remaining arguments. However, on remand, the ALJ should take note that the alleged onset date was amended to December 1, 2007 as stated at the hearing on May 12, 2011, and upon which both plaintiff and defendant agree. (Tr. at 34), [doc. # 18], [doc. #28].

---

[5] The Court notes that the ALJ still has the obligation to develop the record even when the plaintiff is represented by counsel. See Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Nevertheless, the plaintiff's counsel should endeavor to update the plaintiff's treatment records with Dr. Jarda and LCSW Beckford to ensure that the record is complete on remand.

**VII.   CONCLUSION**

This case is **REVERSED and REMANDED** pursuant to sentence four of Section 205(g) of the Social Security Act, 42 U.S.C. §405(g). Plaintiff's Motion to Reverse the Decision of the Commissioner **[Doc. #18]** is **GRANTED** and Defendant's Motion to Affirm the Decision of the Commissioner **[Doc. #28]** is **DENIED**.

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order.  Failure to object within fourteen (14) days may preclude appellate review.  See 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989) (per curiam); FDIC v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED at Bridgeport this 19th day of July 2012.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

40